IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

CANDACE L. SLAYTON,

       Plaintiff,

vs.                                                   No.  03cv1003  DJS

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL SECURITY,

       Defendant.

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Plaintiff's (Slayton's) Motion to Reverse and Remand for a Rehearing **[Doc. No. 10]**, filed February 2, 2004, and fully briefed on March 30, 2004. On April 22, 2003, the Commissioner of Social Security issued a final decision granting Slayton's claim for supplemental security income benefits but denying her claim for disability insurance benefits. Having considered the arguments, pleadings, administrative record, relevant law, and being otherwise fully informed, the Court finds the motion to remand for a rehearing is well taken and will be GRANTED.

### I.  Factual and Procedural Background

Slayton, now fifty-nine years old, protectively filed her application for disability insurance benefits and supplemental security income benefits on February 7, 2002, alleging disability since June 15, 1997, due to back, hip and leg problems and high blood pressure. Slayton amended her alleged onset date to May 23, 2000. Tr. 89. Slayton has an eighth grade education and past relevant work as a cashier, bus driver, and truck driver. Tr. 60. On March 25, 2003, the

Commissioner's Administrative Law Judge (ALJ) held a hearing. Tr. 231-246. On April 22, 2003, the ALJ entered a partially favorable decision, finding Slayton disabled beginning November 2, 2001. Tr. 15. However, the ALJ found Slayton "was NOT DISABLED at any time on or before March 31, 2001, when she was last insured for disability benefits, and therefore she [was] not entitled to a period of disability and disability insurance benefits." Tr. 20. Specifically, the ALJ found Slayton's "condition did not preclude her from performing light or sedentary work activity prior to November 2, 2001." Tr. 17. Moreover, although Slayton is medically eligible for supplemental security income benefits, because her husband's income exceeds the monthly cap set by the agency's regulations, she does not qualify for these benefits. Slayton filed a Request for Review of the decision by the Appeals Council. On July 3, 2003, the Appeals Council denied Slayton's request for review of the ALJ's decision. Hence, the decision of the ALJ became the final decision of the Commissioner for judicial review purposes. Slayton seeks judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g).

## II. Standard of Review

The standard of review in this Social Security appeal is whether the Commissioner's final decision is supported by substantial evidence and whether he applied correct legal standards. *Hamilton v. Secretary of Health and Human Services,* 961 F.2d 1495, 1497-98 (10th Cir. 1992). Substantial evidence is more than a mere scintilla and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Glass v. Shalala*, 43 F.3d 1392, 1395 (10th Cir. 1994). "Evidence is not substantial if it is overwhelmed by other evidence in the record or constitutes mere conclusion." *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992). Moreover, "all of the ALJ's required findings must be supported by substantial evidence,"

*Haddock v. Apfel,* 196 F.3d 1084, 1088 (10th Cir. 1999), and all of the relevant medical evidence of record must be considered in making those findings, *see Baker v. Bowen*, 886 F.2d 289, 291 (10th Cir. 1989). "[I]n addition to discussing the evidence supporting his decision, the ALJ must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects." *Clifton v. Chater*, 79 F.3d 1007, 1010 (10th Cir. 1996). Therefore, while the Court does not reweigh the evidence or try the issues de novo, *see Sisco v. United States Dep't of Health & Human Servs.*, 10 F.3d 739, 741 (10th Cir. 1993), the Court must meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings, in order to determine if the substantiality test has been met. *See Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994).

### III. Discussion

In order to qualify for disability insurance benefits or supplemental security income, a claimant must establish a severe physical or mental impairment expected to result in death or last for a continuous period of twelve months which prevents the claimant from engaging in substantial gainful activity. *Thompson v. Sullivan*, 987 F.2d 1482, 1486 (10th Cir. 1993)(citing 42 U.S.C. §423(d)(1)(A)). The regulations of the Social Security Administration require the Commissioner to evaluate five factors in a specific sequence in analyzing disability applications. 20 C.F.R. § 404.1520 (a-f). The sequential evaluation process ends if, at any step, the Commissioner finds the claimant is not disabled. *Thompson*, 987 F.2d at 1487.

At the first four levels of the sequential evaluation process, the claimant must show she is not engaged in substantial gainful employment, she has an impairment or combination of impairments severe enough to limit her ability to do basic work activities, and her impairment

meets or equals one of the presumptively disabling impairments listed in the regulations under 20 C.F.R. Part 404, Subpt. P, App. 1, or she is unable to perform work she had done in the past. 20 C.F.R. §§ 404.1520 and 416.920. At the fifth step of the evaluation, the burden of proof shifts to the Commissioner to show the claimant is able to perform other substantial gainful activity considering her residual functional capacity, age, education, and prior work experience. *Id.*

In support of her motion to reverse, Slayton makes the following arguments: (1) the ALJ's residual functional capacity determination is contrary to the evidence and the law; and (2) the ALJ's past relevant work finding is contrary to law.

**A. Residual Functional Capacity Determination**

Residual functional capacity (RFC) is defined as "the maximum degree to which the individual retains the capacity for sustained performance of the physical-mental requirement of jobs." 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(c). In arriving at an RFC, agency rulings require an ALJ to provide a "narrative discussion describing how the evidence supports" his or her conclusion. See SSR 96-8p, 1996 WL 374184, at *7. The ALJ must "discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis . . . and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record." *Id.* The ALJ must also explain how "any material inconsistencies or ambiguities in the case record were considered and resolved." *Id.* "The RFC assessment must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical or other evidence." *Id.*

4

Slayton contends the ALJ's RFC is "simply unsupported by the evidence." Pl.'s Mem. in Supp. of Mot. to Reverse at 7. Slayton further contends the ALJ's finding that she could do sedentary or light work from May 12, 2000, the alleged disability onset date, through November 2, 2001, the date on which the ALJ determined she became disabled, is contrary to the evidence. The record for this period indicates as follows:

On **May 12, 2000**, Slayton saw Dr. Nancy Ciavarri at the Rehoboth McKinley Christian Health Clinic for "increasing pain in her lower back . . . ." Tr. 144-145. Slayton rated her pain an "8" on a scale of 10. Tr. 146. Slayton also complained about increased pain in her left shoulder. Dr. Ciavarri noted Slayton was having weakness in her right leg and difficulty continuing her exercise program which caused her to gain more weight. Slayton complained that "she [was] in a vicious cycle of pain in the back and hips that [was] exacerbated by her inability to lose the weight." Tr. 144. Significantly, Slayton had to increase the Darvocet to three times a day to help control the pain. Slayton also was taking Ibuprofen daily and Flexeril (muscle relaxant) two to three times a day. Dr. Ciavarri performed a physical examination and noted:

> Pushing in the paraspinous muscles in the C-spine at about the level of C6-C7, produces some pain and throbbing in the left upper extremity. Strength was 4/5 in the left compared to 5/5 in the right based on grip. There is pain in the left upper extremity with abduction. She has full range of motion of the head. She has a stiff gait, especially when getting up from a chair and starting to walk. This improves after she is up for awhile. She has tenderness over both hips, especially the right. Complete neurologic exam is not done at this point.

Tr. 145. Dr Ciavarri assessed Slayton with (1) history of chronic back problems involving lumbar disk disease; (2) left shoulder pain, possibly cervical radiculopathy versus thoracic outlet type syndrome; and (3) obesity and weight gain. Dr. Ciavarri referred her to physical therapy, refilled

5

her Darvocet and her Ibuprofen. Dr. Ciavarri also referred her to Dr. P. Ceriani, an orthopedist, to address the issue "of whether or not Slayton should be on social security/disability." Tr, 145.

On **May 23, 2000**, Dr. Ciavarri evaluated Slayton for obesity and left arm pain. Tr. 147. Slayton reported her pain was an "8" on a scale of 10. Tr. 148. Dr. Ciavarri noted Slayton was doing well on the appetite suppressant but was having "difficulty exercising secondary to back problems and a long history of sciatica on the right." *Id.* Dr. Ciavarri assessed her with "chronic low back pain and right sciatic nerve pain and left arm pain, probable cervical radiculopathy." *Id.* Dr. Ciavarri recommended she keep her appointment with the orthopedist and attend physical therapy.

On **June 15, 2000**, Slayton had x-rays of the spine done. Tr. 149. The x-rays indicated "a **far advanced discogenic disease at the level of L4-5 and L5-S1**." *Id.* (emphasis added). The radiologist recommended an MRI be done. Slayton's March 1997 MRI indicated "a very large L3-4 disc herniation, some asymmetric degenerative bulging at L5-S1 and somewhat of a spinal stenosis at L3-4." Tr. 147.

Dr. Ceriani, an orthopedic surgeon, evaluated Slayton on the same day, June 15, 2000. Dr. Ceriani noted:

> The patient has a rather lengthy history of which I have many records. She is being followed by an orthopedic surgeon in Flagstaff. <u>She has a diagnosis of lumbar spinal stenosis with a disk herniation at lumbar 3-4, 4-5 that is significant</u>. She was a truck driver for years, and now is 'disabled' as a result of the findings. She is also having increasing pain in the left shoulder, cannot get the arm up over the head and has nightime pain.
> \*\* \*\* \*\* \*\* \*\* \*\*
> ORTHOPEDIC FINDINGS: The overall finding show <u>limited range of motion of the lumbar spine</u>. She has <u>30 degrees of forward flexion, 15 degrees of extension. Flexion rotations are reduced significantly</u>. Heel and toe walking is intact.

6

> Neurologic confirms some <u>tenderness in the anterolateral leg</u>. Two point discrimination is unremarkable. <u>The straight leg raising is positive on the right side</u>. No other findings are noted.
>
> Left shoulder: this shoulder is very stiff, less than 80 degrees of abduction, forward flexion. Pain with passive motion and external rotation with lots of tenderness. The shoulder is very stiff. Neurologic: normal.
>
> X-ray spine films show <u>significant degenerative disease at L5-S1, narrowing the spinal tube generally</u>. The left shoulder is not x-rayed.
>
> IMPRESSION:
> 1. Lumbar spinal stenosis with disk disruption syndrome.
> 2. Rotator cuff tear, frozen shoulder syndrome.
> 3. Generalized arthritis.
>
> TREATMENT & PLAN: This is a most difficult case. We did start her on some Vioxx medication for short-term anti-inflammatory effect. <u>There is really not a lot to do for the back situation</u>. **She has a fairly significant disability as a result of this**. We encouraged weight reduction, motion, pool work, etc. The left shoulder is mostly inflammatory. I injected it today with a small amount of Decadron LA and Marcaine. She will start motion strength exercise program. The possibility of MRI scanning and further surgery on that is not ruled out.

Tr. 151(emphasis added).

On **June 20, 2000**, Slayton returned for a follow-up with Dr. Ciavarri. Tr. 154. Slayton reported the "shoulder injection" relieved her pain significantly. Slayton continued to complain of constant back pain. Slayton also reported that despite her pain she continued to walk about 15 minutes a day to help her lose weight. Slayton was taking Flexeril 10 mg three times a day, Ibuprofen 800 mg once daily, and Darvocet N 100, one to two per day to relieve her pain. Slayton was also taking a diuretic, hormone replacement therapy, and an appetite suppressant. Dr. Ciavarri recommended epidural steroid injections and an MRI.

On **July 6, 2000**, Slayton returned to see Dr. Ciavarri. Tr. 155. Slayton reported her left shoulder pain had lessened. Dr. Ciavarri performed a physical examination and noted, "the low back continues to show evidence of weak positive straight leg raising. She is stiff when she

7

walks." *Id.* Dr. Ciavarri also noted, "Review of the spine history and x-rays shows significant degenerative disease of lumbar 4-5 and L5-S1. This precludes her from doing any effective work." *Id.* Dr. Ciavarri opined "her lumbar spine is disabling." *Id.*

On **November 15, 2000**, Slayton returned to see Dr. Ciavarri for her annual pap smear and examination. Tr. 159-160. Dr. Ciavarri noted, "She is disabled because of her back problems." *Id.* Dr. Ciavarri also noted, "She has a history of chronic pain related to herniated disc at L4-5. She did recently see Dr. Ceriani, but he did not feel that she was a surgical candidate and recommended her to continue on current medications." *Id.* Slayton rated her pain a "5" on a scale of 10. Tr. 161. She also reported she continued to make an effort to exercise, usually on her treadmill. However, she had experienced pain down her right leg and that limited her ability to exercise. Dr. Ciavarri noted this was an intermittent problem. Slayton reported she took Darvocet N-100 twice a day and her Ibuprofen 800 mg twice a day. Dr. Ciavarri offered Slayton epidural steroid injections for her back, which Slayton refused.

On **April 23, 2001**, Dr. Hammons took over Slayton's health care. Tr. 164. Dr Hammons noted Slayton had not been able to exercise or get out due to the weather. Slayton reported feeling quite well.

On **October 26, 2001,** Slayton returned to see Dr. Hammons. Tr. 168. Slayton requested a referral to Dr. Charles Esparza, a Physical Medicine and Rehabilitation Specialist, for her back pain. Slayton complained her back pain was not responding well to "just medical treatment" and wanted to apply for disability. Dr. Hammons referred her to Dr. Esparza for her "incapacitating back pain." *Id.*

On **November 2, 2001**, Dr. Esparza evaluated Slayton for complaints of low back and right leg pain with bilateral leg aching and paresthesias. Tr. 175-177. Dr. Esparza's report indicated the following:

> Currently she describes constant aching pain in her low back pain with throbbing and needle sensation with pain radiating down her right buttock and posterior portion of her leg. She also has occasional pain in both legs and numbness and tingling down to the ankles. This usually occurs when she has been standing or walking for long periods of time. These symptoms tend to reduce when she sits. She also has positive shopping cart symptoms of neurogenic claudication. Her back pain is also aggravated by bending, sitting, or standing for long periods, and lifting. She does get some relief when she lies down for short periods and using hot water. She denied any bowel and bladder incontinence. She states she walks with a limp at times, but states she believes this is due to an uneven pelvis.
>
> ** ** ** ** ** ** **
>
> PHYSICAL EXAMINATION: Ms. Slayton is a pleasant female. She is 56 years old. She weighs 194 lbs. and is 5 ft 5 inches tall. She does move with some guarded motions. Waddell's signs are 0/5. She was cooperative throughout the examination and did not exhibit any exaggerated pain behaviors. B.P. 110/68.
>
> General inspection of the low back and lower extremities reveals no gross abnormalities other than some straightening of her lumbar lordosis. No scoliosis is noted. Lower extremities appear to be symmetrical. She does have a pelvic tilt, left side lower than the right. Leg length was tested from the ASIS (anterior superior iliac spine) to the medial malleolus. Right side was 94 cm., left 91 cm.
>
> Lumbar range of motion: Flexion 80 degrees, extension 5 degrees, lateral bend is 10 degrees bilaterally.
>
> Palpation: Spasms present on the right lumbar paraspinals and gluteal region. This area is also quite tender to palpation. Left side is mildly tender, no spasms are present on the lumbar paraspinals or gluteal region. No midline tenderness in the spinous processes. Neurological exam: Motor strength is 5/5 throughout the proximal and distal muscle groups except for the right ankle dorsiflexion, which is 4/5. Sensation is grossly intact to light touch throughout all dermatomes of the lower extremities. Reflexes are 1+ and symmetrical at the knees and ankles. Babinski shows normal response bilaterally. Coordination is normal and symmetrical bilaterally. SLR is negative bilaterally.
>
> Pulses are intact in dorsalis pedis and posterior tibialis bilaterally. No cyanosis is noted in the lower extremities.
>
> Range of motion within the hips, knees and ankles are within normal range with passive range. Review of previous medical records including those from Dr. Ciavarri and also <u>Dr. Ceriani, her orthopedic surgeon, do mention a MRI, which showed evidence of a lumbar</u>

9

stenosis and also a L3-4 herniated disc and L4-5 disc protrusion with L4-5 and L5-S1 degenerative disc findings. Dr. Ceriani also mentions in his note that he feels that she would not be able to perform her previous job.

IMPRESSION/PLAN
1. Lumbar stenosis with evidence of neurogenic claudication in bilateral lower extremities.
2. Lumbar discogenic disease at the L4-5 and L5-S1 levels.
3. History of lumbar disc herniation at L3-4 and protrusion at L4-5 with right lower extremity radicular symptoms, and some evidence of radiculopathy.
4. Leg length discrepancy, left shorter than right.
5. I believe that Ms. Slayton would possibly benefit from an epidural steroid injection occasionally if her symptoms become much more severe in her lower extremities, however, these appear to be more related to her activities, particularly standing and walking, which is consistent with symptoms of neurogenic claudication from stenosis. Therefore, I recommend that she limit her overall standing and walking activities to tolerance. Her stenosis is not expected to improve over time and, in fact, will likely continue to progressively worsen. She does not appear to need any surgical intervention at this time, but again she was informed that any evidence of increasing weakness of sudden onset or bowel and bladder incontinence would be considered an emergency.

6. Regarding her disability status, I agree with Dr. Ceriani's assessment that she would not be able to perform the kind of activities she has in the past. This includes cashiering or any other type of work that would cause her to stand for long periods due to her neurogenic claudication. Additionally, with her leg length discrepancy as a problem and sciatic problems, walking becomes a difficult task for her. Truck driving in itself would not be limiting, but the fact that she is on pain medications, particularly propoxyphene, would be contraindicated for her driving, and any type of loading and unloading activities would also be limited. I think the best work level she would be able to do would be sedentary level activity of 10 lbs. maximal lifting weight or carrying. Occasionally lifting or carrying such articles as dockets or ledgers, and I believe she can only do walking activity on less than an occasional basis.

Tr. 176-177 (emphasis). In his decision, the ALJ stated:

On October 26, 2001, the claimant visited Dr. Hammons and said her back pain was not responding to medical treatment and she wanted to apply for disability benefits. Dr. Hammons referred her to Dr. Esparza who examined her on November 2, 2001 and advised her that she could probably not return to any of her previous jobs, not even that of a cashier. He recommended nothing more than sedentary work, but in light of subsequent progress notes from Dr. Hammons, it appears that the claimant wold not have been capable of sitting for long enough periods of time to do even a full range of sedentary work. Accordingly, beginning November 2, 2001, I find that the medical evidence supports a residual functional capacity for even less than sedentary exertional activities.

> The Administration's program physicians previously reviewed the evidence of record in July and August 2002 and concluded that the claimant retained the capability to perform a wide range of sedentary work (Exhibits B-1B; B-6F). Under the provisions of Social Security Ruling 96-6p, I have considered these professional medical opinions. Based on my review of the record and new medical evidence received after these prior determinations, including the recent statement from Dr. Hammons, I conclude that the claimant has been limited to even less than sedentary work beginning as early as November 2, 2001, when Dr. Esparza advised her she could probably not do any of her previous jobs. Prior to that date the evidence show that her back pain was fairly well-controlled, to the point that she could have done either light or sedentary work.
> 20 CFR 404.1567 and 416.967 define sedentary work as lifting a maximum of 10 pounds, with occasional lifting and carrying of items such as files and small tools. Sedentary work involves primarily sitting, with only occasional standing and walking. The regulations define light work as lifting a maximum of 20 pounds occasionally and 10 pounds frequently. Light work requires considerable standing and walking or sitting with some pushing and pulling of arm or leg controls. For the period prior to November 2, 2001, I find that the claimant retained the capability to perform these basic physical activities.

Tr. 5. The ALJ's RFC determination is not supported by substantial evidence. Dr. Esparza relied on Dr. Ceriani's June 2000 assessment and on the MRI done prior to March 31, 2001, the date when Slayton was last insured for disability benefits. Moreover, although the ALJ mentioned Dr. Ceriani's evaluation, he failed to address Dr. Ceriani's opinion that Slayton was sigificantly disabled. The ALJ's finding that Slayton had been "limited to even less than sedentary work beginning as early as November 2, 2001, when Dr. Esparza advised her she could probably not do any of her previous jobs," but "prior to that date the evidence showed that her back pain was fairly well-controlled, to the point that she could have done either light or sedentary work" also is not supported by substantial evidence. The ALJ failed to explain how he arrived at this conclusion. The record indicates Slayton controlled her pain with Darvocet, Flexeril, and Ibuprofen. Slayton also discussed her efforts to exercise to control her weight to help her back pain. However, the ability to exercise for fifteen minutes or at short intervals does not establish the ability to work an 8-hour workday on a sustained basis. Slayton also reported her need to take rest periods throughout the day to control her pain. All these measures may have lessened

11

Slayton's pain, but they do not support the ALJ's finding that she could perform any of her previous jobs. On remand, pursuant to Social Security Ruling 96-8p, the ALJ should reconsider his RFC determination prior to March 31, 2001. The ALJ should also consult with Dr. Ceriani regarding Slayton's ability to return to her previous jobs prior to March 31, 2001.

**B. Past Relevant Work**

At step four of the sequential evaluation process, a claimant bears the burden of proving that her medical impairments prevent her from performing work that she has performed in the past. *See Williams v. Bowen*, 844 F.2d 748, 751 & n.2 (10th Cir. 1988). However, in order to make the ultimate finding that a claimant is not disabled at step four, the <u>ALJ is required by the agency's rulings to make specific and detailed predicate findings concerning the claimant's residual functional capacity, the physical and mental demands of the claimant's past jobs, and how these demands mesh with the claimant's particular exertional and nonexertional limitations</u>. *See* SSR 96-8p, 1996 WL 374184, SSR 82-62, at *4 (emphasis added), *see also Winfrey v. Chater*, 92 F.3d 1017, 1023-25 (10th Cir. 1996). Here, the ALJ failed to make the detailed findings required by the regulations and rulings at step four. On remand, the ALJ should follow Social Security Ruling 96-8p and the dictates of *Winfrey*.

**C. Conclusion**

Based on the record as a whole, the Court finds the ALJ's RFC determination prior to March 31, 2001, and his finding that Slayton could perform her past relevant work prior to March 31, 2001, are not supported by substantial evidence. The Court will remand this case to allow the ALJ to reassess Slayton's RFC prior to March 31, 2001. In doing so, the ALJ should apply Social Security Ruling 96-8p (Assessing Residual Functional Capacity in Initial Claims), consider

Dr. Ceriani's opinion that Slayton could not to return to her previous jobs at the time of his June 2000 evaluation, and consult with Slayton's treating physicians, including Dr. Ceriani, regarding this matter.

A judgment in accordance with this Memorandum Opinion and Order will be entered.

**DON J. SVET**
**UNITED STATES MAGISTRATE JUDGE**